## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| Curt Stonick,<br><br>                    Plaintiff,<br><br>v.<br><br>Andrew Saul, Commissioner of Social<br>Security,<br><br>                    Defendant. | Civil No. 3:19-cv-01334 (TOF)<br><br><br><br><br><br>October 19, 2020 |

### RULING ON PENDING MOTIONS

The Plaintiff, Curt Stonick, appeals the final decision of the Defendant, Andrew Saul, Commissioner of Social Security ("the Commissioner"), on his application for Title XVI Supplemental Security Income benefits. This appeal is brought pursuant to 42 U.S.C. § 405(g) on the asserted basis that Administrative Law Judge ("ALJ") Deidre R. Horton erred in evaluating the Plaintiff's evidence of disability and rendered a decision that was not supported by substantial evidence. Currently pending are the Plaintiff's motion to reverse and remand for an award and calculation of benefits, or in the alternative, for an order reversing and remanding for a new hearing (ECF No. 16), along with the Defendant's motion to affirm the decision of the Commissioner. (ECF No. 19.) For the reasons explained below, the Defendant's Motion for an Order Affirming the Commissioner's Decision is GRANTED, and the Plaintiff's Motion to Reverse the Decision of the Commissioner is DENIED.

# I.   BACKGROUND

## A.   Facts and Procedural History

In the fall of 2016,[1] the Plaintiff filed an application for Supplemental Security Income Benefits ("SSI") under Title XVI,[2] alleging a disability onset date of May 27, 2016. (R. 177.) He claimed that he could not work because of heart attack, depression, and obsessive compulsive disorder ("OCD"). (R. 59, 202.) The Social Security Administration ("SSA") found that he was "not disabled" on February 1, 2017. (R. 71.) His claim was denied on reconsideration on September 7, 2017. (R. 89.) He requested a hearing before an ALJ, which was held before ALJ Deirdre R. Horton on August 16, 2018. (R. 35-58.) The ALJ issued an unfavorable decision, denying his claim (R. 7-26), and the Appeals Council denied his request for review. (R. 1.) On August 29, 2019, he sought review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (Pl.'s Compl., ECF No. 1.) He filed a motion to reverse and/or remand on February 7, 2020. (ECF No. 16.) The Commissioner filed his motion to affirm on May 7, 2020. (ECF No. 19.)

Portions of the Plaintiff's medical history will be set forth below, as necessary to explain the Court's decision.

---

[1]    The Application Summary for Supplemental Security Income under Title XVI and the Plaintiff's Statement of Material Facts both state that the Plaintiff applied for SSI benefits on October 7, 2016. (R. 177; ECF No. 16-1, at ¶ 1.) The Disability Determination Explanations at the initial and reconsideration level state that the Plaintiff filed his claim on September 19, 2016 (R. 59, 74), as does the ALJ's hearing decision. (R. 10.) There was no material change in the Social Security Regulations between September 19 and October 7, 2016, and the exact date of the application is therefore immaterial to the disposition of these motions.

[2]    The Plaintiff also filed an application for Disability Insurance benefits under Title II of the Social Security Act on September 8, 2016. (R. 173.) It appears as though he did not qualify for these benefits. The Plaintiff explained in his Statement of Material Facts that his application for Title II "appears to have been denied in that Mr. Stonick had 'insufficient quarters of coverage' to qualify. (R. 104.) This case has proceeded as a Title XVI case only." (Pl.'s Stmt. of Material Facts, ECF No. 16-1, at ¶ 1 n.1.)

**B.     The ALJ's Decision**

At Step One, the ALJ found that the Plaintiff had not engaged in substantial gainful activity since the application date of September 19, 2016. (R. 12.) At Step Two, the ALJ found that the Plaintiff suffered from the severe impairments of major depressive disorder in partial remission, OCD, body dysmorphic disorder ("BDD"), and cardiomyopathy status post myocardial infarction. (*Id*. at 12-13.) At Step Three, the ALJ found that the Plaintiff's impairments or combination of impairments do not meet or equal a listed disability enumerated in 20 C.F.R. § 404, Subpart P., App. 1 (20 C.F.R. 416.920(d), 416.925, and 416.926). (R. 13-14.) Next, the ALJ determined that the Plaintiff retained the following residual functional capacity:

> [T]o perform light work as defined in 20 CFR 416.967(b) except no more than occasional climbing of ramps or stairs; no climbing of ladders, ropes or scaffolds; and frequent balancing, stooping, kneeling, crouching, and crawling. He must avoid concentrated exposures to vibrations and must not work around hazardous machinery (open fast moving parts) and unprotected heights. He must have no concentrated exposures to respiratory irritants such as dusts, fumes, gases, etc. and no temperature extremes. He is limited to simple, routine tasks; he can relate appropriately with others and should only have occasional direct interactions and needs to do tasks alone rather than in groups or teams, with no work in the general public.

(R. 14, 14-19.)

At Step Four, the ALJ found that the Plaintiff cannot perform any of his past relevant work. (R. 19-20.) Finally, at Step Five, the ALJ relied on the testimony of a Vocational Expert ("VE") to find that there are jobs that exist in the national economy that the Plaintiff can perform, including "Marker II," "Fruit Distributor," and "Domestic Laundry Worker." (R. 20-21.) Accordingly, the ALJ determined that the Plaintiff was not disabled since the date the application was filed. (R. 21.)

## II.   APPLICABLE LEGAL PRINCIPLES

To be considered disabled under the Social Security Act, "a claimant must establish an 'inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.'" *Smith v. Berryhill*, 740 F. App'x 721, 722 (2d Cir. 2018) (summary order) (quoting 20 C.F.R. § 404.1505(a)).   To determine whether a claimant is disabled, the ALJ follows a familiar five-step evaluation process.

At Step One, the ALJ determines "whether the claimant is currently engaged in substantial gainful activity . . . ." *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)).   At Step Two, the ALJ analyzes "whether the claimant has a severe impairment or combination of impairments . . . ." *Id.*   At Step Three, the ALJ evaluates whether the claimant's disability "meets or equals the severity" of one of the specified impairments listed in the regulations.  *Id.*  At Step Four, the ALJ uses a "residual functional capacity" ("RFC") assessment to determine whether the claimant can perform any of her "past relevant work . . . ." *Id*.   At Step Five, the ALJ assesses "whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's [RFC], age, education, and work experience." *Id.*   The claimant bears the burden of proving her case at Steps One through Four. *Id.*   At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r,* 683 F.3d 443, 445 (2d Cir. 2012) (per curiam).

In reviewing a final decision of the Commissioner, this Court "perform[s] an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981).   The Court's role is to determine whether the Commissioner's decision is supported by substantial evidence and free from

4

legal error. "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted). The decision is supported by substantial evidence if a "reasonable mind" could look at the record and make the same determination as the Commissioner. *See Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . .") (citations omitted). Though the standard is deferential, "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (quotation marks and citations omitted). When the decision is supported by substantial evidence, the Court defers to the Commissioner's judgment. "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [this Court] will not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

The Commissioner's conclusions of law are not entitled to the same deference. The Court does not defer to the Commissioner's decision "[w]here an error of law has been made that might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## III.   DISCUSSION

The Plaintiff argues that the ALJ erred in several ways. The Court will address each of the Plaintiff's arguments in the order of the sequential evaluation process described above, rather than as they appear in his brief. First, he asserts that the ALJ failed to follow the treating physician rule when assigning weight to the opinions of the Plaintiff's treating providers, the consultative examiner, and the state agency Disability Determination Services ("DDS") consultants. (ECF No. 16-2, at 17-18.) Second, he argues that the ALJ failed to consider his BDD-related limitations when assessing his level of impairment. (*Id.* at 22-24.) Third, he argues that the ALJ did not properly take his limitations in "maintaining pace, concentrating, adapting to the workplace" and "persist[ing] in simple activities without interruption from psychological symptoms" into account when assessing his RFC. (*Id.* at 14-15, 22-24.) Fourth, he argues that the ALJ's Step Five findings are inadequate due to errors in the testimony of the VE, Dr. James Soldner, and in the hypothetical question posed to the VE by the ALJ. (*Id.* at 1-17.) For the following reasons, the Court finds that the ALJ's decision contained no legal error and was supported by substantial evidence in the record.

### A.   The ALJ Did Not Traverse the Treating Physician Rule

The "treating physician rule" applies to claims filed before March 27, 2017. 20 C.F.R. § 416.927. The Plaintiff applied for SSI in September or October of 2016, alleging an onset date of May 27, 2016. (R. 177.) Under the treating physician rule, the ALJ must give the treating physician's opinion "controlling weight" when the opinion is supported by and consistent with the record. § 416.927(c)(2). As stated in the Social Security Regulations, "[i]f we find that a treating source's medical opinion on the issue(s) of the nature and severity of [the plaintiff's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the plaintiff's] case record, we will give it controlling weight." *Id*. The "treating physician" or "treating source" must be an "acceptable medical source" that "provides [the plaintiff], or has provided [the plaintiff], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff.]" § 416.927(a)(1)-(2). For claims filed before March 27, 2017, only licensed physicians, licensed psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists are considered "acceptable medical sources." 20 C.F.R. § 416.902(a).

If the ALJ decides that a treating source's opinion is not entitled to controlling weight, she must then determine how much weight to give it. When doing so, the ALJ must explicitly consider several factors, known as the "*Burgess* factors," which are: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist." *Selian v. Astrue,* 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (citing *Burgess,* 537 F.3d at 129-30). "At both steps, the ALJ must give good reasons in its notice of determination or decision for the weight it gives the treating source's medical opinion." *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019) (quotation marks and alterations omitted) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam)). It is generally considered a "procedural error" when an ALJ fails to "explicitly apply the *Burgess* factors when assigning weight" to a treating physician's opinion. *Estrella*, 925 F.3d at 96 (quotation marks omitted). But when "a searching review of the record assures [the Court] that the substance of the treating physician rule was not traversed, [the Court] will affirm." *Id.* (quotation marks omitted).

The opinions of non-treating sources are not entitled to controlling weight, but the ALJ must still explain the weight that she assigns to those opinions. *See* 20 C.F.R. § 416.927(f) ("The

adjudicator generally should explain the weight given to opinions from [medical sources who are not acceptable medical sources and nonmedical sources] or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."). The ALJ considers six factors when evaluating the opinion evidence: (1) the "examining relationship"; (2) the "treatment relationship," including the "length of the treatment relationship and the frequency of examination" and the "nature and extent of the treatment relationship"; (3) the "supportability" of the medical opinion; (4) the consistency of the medical opinion "with the record as a whole"; (5) the specialization of the source; and (6) "any factors [the claimant] or others bring to [the ALJ's] attention, or of which [the ALJ is] aware, which tend to support or contradict the medical opinion." 20 C.F.R. § 416.927(c)(1)-(6). The ALJ is not required to make a "slavish recitation" of all of these factors "where the ALJ's reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) (citing *Halloran*, 362 F.3d at 31-32).

In this case, the administrative record contains the following opinion evidence: a consultative examination report from Liese Franklin-Zitzkat, Psy.D (R. 736-741); two medical source statements from Joyce Oen-Hsiao, M.D. (R. 742-748, 1292-1300); two joint impairment questionnaires from Leshae Rice, Licensed Alcohol and Drug Counselor ("LADC")[3] and Maura Fischer, Advanced Practice Registered Nurse ("APRN") (R. 749-756, 1311-1317); an impairment

---

[3]     Though Ms. Rice has a Master's Degree in Psychology (R. 754), she does not appear to be a "licensed or certified psychologist at the independent practice level." 20 C.F.R. § 416.902(a). She is identified as an LADC (R. 1315), and licensed professional counselors are not acceptable medical sources. *See, e.g.*, *Gaskin v. Berryhill*, 3:18-cv-01978 (RAR), 2020 WL 3958421, at *7 (D. Conn. July 13, 2020) (finding that an LADC was not an acceptable medical source and her opinion was not entitled to controlling weight); *James C. v. Comm'r of Soc. Sec.*, No. 2:19-cv-38, 2020 WL 103813, at *7 (D. Conn. Jan. 9, 2020) (same).

questionnaire from Ms. Fischer  (R. 938-947); a disability determination explanation at the initial level from Thomas Hill, M.D. and Keith Kaplan, M.D. (R. 59-71); and a disability determination explanation at the reconsideration level from Deborah Stack, Ph.D and Peter Amato, M.D. (R. 73-89.)

The ALJ awarded "partial weight" to the opinions of Dr. Franklin-Zitzkat, Dr. Oen-Hsiao, Ms. Rice, and Ms. Fischer  (R. 17-18); and "great weight" to the opinions of the DDS consultants at the initial level.  (R. 19.)  She also gave "great weight" to the opinions of the DDS consultants at the reconsideration level were "to the extent that they [were] consistent with the [RFC] arrived at by the undersigned.  To the extent that they [were] inconsistent, they [were] given less weight." (R. 19.)  The Plaintiff argues that the ALJ made the treating physician rule "stand on its head" by assigning "great weight" to the opinions of the DDS consultants at the initial level, and giving "every treating clinician . . . nothing more than 'partial weight.'"  (ECF No. 16-2, at 18.)  He states that remand is required because "[i]t is impossible to argue that the 'Burgess factors' were explicitly applied . . . ."  (*Id.* at 19.)  In response, the Commissioner argues that the ALJ properly "consider[ed] and resolve[d] conflicts in the evidence" and did not violate the treating physician rule.  (ECF No. 19-1, at 7-9.)  The Court will address each provider and the weight the ALJ assigned to his or her opinions in turn.

### i.    Dr. Franklin-Zitzkat's Consultative Examination Report

Dr. Franklin-Zitzkat is a clinical psychologist who performed a mental status examination on January 31, 2017, at the request of the SSA.  (R. 736-741.)  The ALJ assigned only partial weight to Dr. Franklin-Zitzkat's evaluation, concluding that several of the "marked" limitations that she had assessed were not consistent with the record as a whole.  The Plaintiff contends that the ALJ's stated reasoning for ascribing partial weight to this opinion "does not withstand analysis

under the standard set forth in [*Estrella,* 925 F.3d at 90]."  (ECF No. 16-2, at 18-19.)  In *Estrella*, the Second Circuit concluded that the ALJ had erred by assigning "little weight" to the opinion of a treating physician without "explicitly considering" the *Burgess* factors or providing "good reasons" to support that decision.  925 F.3d at 97-98.  But the *Estrella* standard does not apply here, since Dr. Franklin-Zitzkat is a consultative examiner, and the ALJ does not need to assign controlling weight to the consultative examiner's opinions or provide "good reasons" for her decision.  *See Pellam v. Astrue*, 508 F. App'x. 87, 89 (2d Cir. 2013) ("There is no requirement that the agency accept the opinion of a consultative examiner concerning a claimant's limitations . . . .") (summary order); *Pappas v. Saul*, 414 F. Supp. 3d 657, 675 (S.D.N.Y. 2019) ("[T]he same rule requiring the ALJ provide 'good reasons' [for the weight assigned to] a treating source's opinion does not apply to non-treating sources.").  While the *Estrella* requirement does not apply here, the ALJ was still required to explain why she gave "partial weight" to Dr. Franklin-Zitzkat's opinion.  The Court concludes that the ALJ did not commit error in her weighing of Dr. Franklin-Zitzkat's opinion and explained her reasoning for giving the opinion "partial weight."

The ALJ gave "some weight" to Dr. Franklin-Zitzkat's opinion that the Plaintiff would have marked difficulty in "sustaining concentration in an office setting," but concluded that the Plaintiff's concentration was not impaired "to the extent found by Dr. Franklin-Zitzkat."  (R. 17, 739.)  The ALJ explained that a "marked" level of impairment is inconsistent with the Plaintiff's treatment records, which "consistently indicate that the claimant's attention was intact . . . ." (R. 17.)  As the ALJ noted, mental health treatment records from Ms. Rice and Ms. Fischer, spanning a period of approximately two years, consistently showed that the Plaintiff's attention was intact and normal.  (R. 840, 850, 858, 864, 870, 905,  912, 915, 922, 927, 930, 1041, 1045, 1052, 1067, 1093, 1101, 1106, 1117, 1127, 1138, 1143, 1150, 1175, 1179, 1183, 1191, 1198, 1217, 1202, 1209,

1221, 1235, 1306.)  "The ALJ was entitled to consider the lack of evidence [in the treatment records] demonstrating severe mental limitations, such as marked difficulties with memory and concentration . . . ."  *Worthy v. Berryhill,* No. 3:15-CV-1762 (SRU), 2017 WL 1138128, at *9 (D. Conn. Mar. 27, 2017) (internal quotation marks omitted).

Dr. Franklin-Zitzkat also opined that the Plaintiff would have marked difficulty maintaining attendance, remaining at his post, and withstanding the stresses and pressures of a routine workday. (R. 739.)  The ALJ "did not find support in the record" for this opinion. (R. 17.) The ALJ noted that the Plaintiff "consistently attended cardiac rehabilitation, and he continued going to the gym on a regular basis after rehabilitation was completed," which indicated that he could "commit to a regular routine for a sustained period of time." (R. 17-18.)  The Plaintiff argues that "[t]here is no logical basis for the ALJ's equating of a program of cardiac exercise with an eight hour work day . . . ." (ECF No. 16-2, at 19.)  But the ALJ's conclusion that the Plaintiff would be able to maintain a regular work routine was supported by more than just his exercise activity.  Specifically, the ALJ concluded that the Plaintiff had maintained an exercise routine, that his treatments for his mental health impairments had been "primarily successful" (R. 16-17), and that the Plaintiff could independently perform many other activities of daily living, including working part-time. (R. 17.)  Her conclusion is also supported by other substantial evidence in the record.  Both agency reviewers concluded that the Plaintiff's ability to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances" was only moderately limited,[4] and his ability to complete a normal workday and workweek was not

---

[4]     Moderate limitations in work-related functioning do not necessarily negate an ALJ's conclusion that a claimant can perform unskilled work.  *See Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (although examining clinicians found "moderate limitations in [claimant's] work-related functioning . . . the ALJ's determination that [she] could perform her previous unskilled work was well supported").

significantly limited. (R. 68, 86.) "An ALJ need not recite every piece of evidence that contributed to the decision, so long as the record permits us to glean the rationale of an ALJ's decision." *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (internal quotation marks omitted).

The ALJ appropriately weighed Dr. Franklin-Zitzkat's opinion against other evidence in the record and reached a reasonable conclusion. It is within the ALJ's discretion to weigh "conflicting . . . evaluations of [a claimant's] present condition" and "resolve that evidence . . . ." *Veino*, 312 F.3d at 588. *See also Pellam*, 508 Fed.App'x. at 90 (holding that the ALJ was not required to adopt all the consultative examiner's conclusions, in part because those conclusions were inconsistent with the plaintiff's medical records). Accordingly, the court finds no error in the ALJ's assignment of partial weight to Dr. Franklin-Zitzkat's opinion.

### ii. Dr. Oen-Hsiao's Medical Source Statement

Dr. Oen-Hsiao is the Plaintiff's cardiologist and treated his coronary artery disease/ischemic cardiomyopathy. (R. 319, 1017). Dr. Oen-Hsiao submitted two medical source statements: the first from March 10, 2017 (R. 742-47) and the second from August 2018 (R. 1293-98.) The ALJ assigned "partial weight" to both of her opinions. (R. 17-18.) Because Dr. Oen-Hsiao is a treating physician, the ALJ was ostensibly required to explicitly weigh the *Burgess* factors and provide "good reasons" for assigning less than controlling weight. *Estrella*, 925 F.3d at 96. In this case, the ALJ did not explicitly apply the *Burgess* factors when assigning "partial weight" to Dr. Oen-Hsaio's opinions. The Court concludes, however, that a "searching review" of the record shows that the ALJ did not traverse the substance of the treating physician rule. *Id.*

The ALJ agreed with the majority of Dr. Oen-Hsiao's first opinion, but held that "there is no support in the record for Dr. Oen-Hsaio's opinion that [the Plaintiff] can only sit or walk for up to one hour at a time . . . ." (R. 18.) The record supports the ALJ's conclusion that Plaintiff had a

greater capacity for walking and sitting than indicated in Dr. Oen-Hsaio's opinion. During a cardiac rehab follow-up visit on July 26, 2016, Dr. Richard Shaw reported that the Plaintiff had "good exercise tolerance," was able to attend ten exercise sessions, and exercised for forty-five minutes at each session. (R. 311.) On August 19, 2016, Dr. Oen-Hsaio reported that the Plaintiff was doing cardio for forty-five minutes a day, five to six days a week, and lifting twenty-pound weights. (R. 1003.) On March 10, 2017, Dr. Oen-Hsaio noted that the Plaintiff had completed cardiac rehab and was able to exercise at 3.8 mph on a treadmill. (R. 1008.) On June 9, 2017, Dr. Oen-Hsaio noted that the Plaintiff was exercising on the treadmill for an hour every day. (R. 1012.) On February 16, 2018, Dr. Oen-Hsaio reported that the Plaintiff was doing "cardio ([three] miles) every day . . . ." (R. 1017.) During his disability benefits hearing, the Plaintiff commented that he "can go for walks at a normal pace." (R. 43.) Finally, in her August 2, 2018 opinion, Dr. Oen-Hsaio concluded that the Plaintiff could sit, stand, and walk for eight hours in a workday. (R. 1294.) The ALJ noted that Dr. Oen-Hsaio's second opinion concerning sitting and standing was "more consistent with the record, as there is no indication that the claimant has had any problems in these areas." (R. 18.)

The ALJ also rejected Dr. Oen-Hsaio's first opinion to the extent that it concluded that the Plaintiff could frequently climb ramps, stairs, ladders, and scaffolds, since it was not consistent with the Plaintiff's cardiac history. (R. 18.) The reports from the DDS consultants at the initial and reconsideration levels both limited the Plaintiff to "occasionally" climbing ramps and stairs and "never" climbing ladders, ropes, and scaffolds. (R. 65, 83.) The Plaintiff also testified during his benefits hearing that he has trouble going up stairs. (R. 43.) It appears that the ALJ credited the Plaintiff's testimony, along with the opinions of the DDS consultants, and assessed a more generous limitation than Dr. Oen-Hsaio assessed. "The fact that the ALJ afforded Plaintiff the

benefit of the doubt and included" a more restrictive physical limitation "in the RFC assessment is not grounds for remand." *Lesanti v. Comm'r of Soc. Sec.,* 436 F. Supp. 3d 639, 649 (W.D.N.Y. 2020).

The ALJ also agreed with the majority of Dr. Oen-Hsiao's second opinion, but held that "there is no support in the record for the revised opinion regarding lifting and carrying restrictions." (R. 18.)  In her first opinion, Dr. Oen-Hsiao had opined that the Plaintiff could occasionally lift and carry up to twenty pounds and frequently lift and carry up to ten pounds.  (R. 752.)  She "revised" her second opinion and concluded that the Plaintiff could occasionally lift and carry up to 100 pounds and frequently carry up to fifty pounds (R. 1293), which would allow him to be placed in the "medium work" category.  20 C.F.R. § 416.967(c).  A progress note from Dr. Oen-Hsaio on June 9, 2017 shows that the Plaintiff was lifting only "light dumbbells" while exercising at the gym.  (R. 1013.)  Another progress note from Dr. Oen-Hsiao on February 16, 2018 showed that the Plaintiff was able to lift "[ten] pounds in each arm without difficulty."  (R. 1017.)  During the disability benefits hearing, the Plaintiff testified that he was not able to lift any more than ten pounds due to his cardiac issues.  (R. 42, 46.)  Again, it appears that the ALJ credited the Plaintiff's testimony and Dr. Oen-Hsiao's chart notes and assessed a more generous limitation than Dr. Oen-Hsaio assessed in the second opinion.  This is not a basis for remand.

Though the ALJ did not explicitly consider the *Burgess* factors when reviewing Dr. Oen-Hsiao's medical source opinions, a "searching review" of the record shows that her decision was supported by "good reasons" and that "the substance of the treating physician rule was not traversed." *Estrella*, 925 F.3d at 96.  The sections that the ALJ disagreed with and, therefore, assigned less weight to, were inconsistent with the medical records, the DDS consultant opinions,

and the Plaintiff's testimony.  In sum, the ALJ properly weighed Dr. Oen-Hsaio's opinions and assigned less weight to those parts that were inconsistent with substantial evidence in the record.

### iii.      Ms. Rice and Ms. Fischer's Impairment Questionnaires

There are three opinions on file from the Plaintiff's mental health treatment providers, Ms. Rice and Ms. Fischer.  The first is a joint impairment questionnaire from Ms. Rice and Ms. Fischer, dated June 9, 2017.  (R. 749-754 ("First Opinion").) The second is an impairment questionnaire from Ms. Fischer, dated March 20, 2017.  (R. 938-946 ("Second Opinion").)  The third is a joint impairment questionnaire from Ms. Rice and Ms. Fischer, dated August 13, 2018.  (R. 1312-1317 ("Third Opinion").)  The Plaintiff does not argue that Ms. Rice and Ms. Fischer were treating providers whose opinions are entitled to controlling weight.  (ECF No. 16-2, at 22.)[5]  He does, however, assert that their opinions were "entitled to far greater weight than the ALJ afforded them."  (*Id.*)

The main source of disagreement appears to be with the Plaintiff's level of limitation in attention, persistence, and performance of activities at a reasonable pace.  The ALJ disagreed with

---

[5]      As noted *supra* footnote 3, Ms. Rice appears to be a licensed clinical social worker. Licensed clinical social workers are not "acceptable medical sources" and their opinions are therefore not entitled to controlling weight under the treating physician rule.  *See, e.g., Grega v. Saul*, 816 Fed. App'x 580, 583 (2d Cir. 2020) (summary order) (holding that a licensed clinical social worker is not an acceptable medical source under the regulations); *McQuillan v. Saul*, No. 3:19-CV-00191 (SRU), 2020 WL 1545778, at *11 (D. Conn. Apr. 1, 2020) ("[L]icensed clinical social workers, and therapists, among others, are considered 'other sources.' . . . . those opinions do not demand the same deference as those of a treating physician.").  Similarly, APRNs are not considered acceptable medical sources in cases filed before March 27, 2017.  *See* 20 C.F.R. § § 416.902(a) ("Acceptable medical source means a medical source who is a . . . . Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice (*only with respect to claims filed (see § 404.614) on or after March 27, 2017*) . . . ." (emphasis added)).  *See also Kelly v. Berryhill*, No. 3:17-CV-1703 (VLB), 2019 WL 1332176, at *10 (D. Conn. Mar. 25, 2019) (holding that the treating physician rule did not apply to an APRN and the APRN's opinion was not entitled to controlling weight); *Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 400 (D. Conn. 2012) (finding that an APRN "does not fall within the category of 'acceptable medical sources'").

the First Opinion insofar as it stated that the Plaintiff had a reduced ability to "perform[] basic activities at a reasonable pace." (R. 18, 753.) The ALJ disagreed with the Second Opinion insofar as it stated that the Plaintiff would be "seriously limited in maintaining attention for [two]-hour segments and completing a normal workday without being distracted by symptoms, and would be unable to perform at a reasonable pace without unreasonable breaks . . . ." (R. 18.) The ALJ disagreed with the Third Opinion insofar as it stated that the Plaintiff "would be seriously limited in maintaining attention for [two]-hour segments . . . and would be unable to perform at a reasonable pace without unreasonable breaks . . . . or complete a normal workday without being distracted by symptoms." (*Id.*) A review of the record shows that the ALJ's decision to accord little weight to these assessments is supported by substantial evidence.

The treatment records from both Ms. Rice and Ms. Fischer consistently indicated that the Plaintiff's attention was intact and normal. (R. 840, 850, 858, 864, 870, 905, 912, 915, 922, 927, 930, 1041, 1045, 1052, 1067, 1093, 1101, 1106, 1117, 1127, 1138, 1143, 1150, 1175, 1179, 1183, 1191, 1198, 1217, 1202, 1209, 1221, 1235, 1306.) In the many documented visits, only once did Ms. Fischer write "[a]ttention: required some support." (R. 845.) Additionally, the severe limitations that Ms. Rice and Ms. Fischer assessed in the Third Opinion are inconsistent with their treatment notes from that approximate time period. On June 13, 2018, Ms. Rice performed a three-month assessment of the Plaintiff's progress. She wrote that he had made "significant" progress during the review period. (R. 1171.) The Plaintiff reported that he was attending all medical appointments and he had been feeling well. (R. 1173.) His GAF score was 60. (R. 1171.) The next day, Ms. Rice and the Plaintiff discussed his health concerns and his coping methods for avoiding excessive worry. (R. 1168-1170.) His Mental Status Exam was generally normal, though his mood was "euthymic, sad." (R. 1169.) In the most recent record from Ms. Fischer, on June 8,

2018, the Plaintiff spoke about his plans to open a vape store and reported that he was feeling "back to normal" with his daily dosage of Lexapro. (R. 1174, 1176.) His Mental Status Exam was normal. (R. 1174-76.)

In addition, the records show that the Plaintiff's mental health symptoms had improved with medication and therapy. On May 11, 2018 and June 8, 2018, the Plaintiff told Ms. Fischer that he was taking Lexapro to "reduce OCD symptoms and to reduce anxiety" and that he felt "back to normal" and "able to leave his house and feel comfortable." (R. 1174, 1184.) On June 13, 2018, Ms. Rice stated that he had shown significant progress and that he was taking an additional antidepressant which "really boosted his mood." (R. 1171.) He was utilizing his family support system, attending community meetings, "identify[ing] triggers for mental symptoms" and finding ways to cope with symptoms through Cognitive Behavioral Therapy and mindfulness. (R. 1171-72.) In the Third Opinion, Ms. Rice and Ms. Fischer reported that the Plaintiff "has responded well to treatment/medication." (R. 1312.)

Finally, the evaluations from the DDS psychological consultants and the objective findings from Dr. Franklin-Zitzkat's examination also support a conclusion that the Plaintiff's attention, persistence, and pace are not markedly or extremely limited. Dr. Hill concluded that the Plaintiff's abilities to maintain attention, concentrate, and perform at a consistent pace were not significantly limited, noting that the Plaintiff's "[a]nxiety and OCD [symptoms] occasionally distract him and occasionally limit following schedules and carrying out detailed instructions." (R. 68.) Dr. Stack concluded that the Plaintiff's ability to maintain attention and concentration for extended periods was moderately limited and his ability to perform at a consistent pace was not significantly limited. (R. 86.) During her consultative examination, Dr. Franklin-Zitzkat observed that the Plaintiff's attention "seemed unimpaired" and his concentration seemed "moderately impaired." (R. 738.)

Dr. Franklin-Zitzkat's conclusion that the Plaintiff would have "marked difficulty sustaining concentration in an office setting" was not based on these objective findings, but on the Plaintiff's self-reported limitations.  (R. 739 (expected difficulty "based on his self-report").)

As the Plaintiff argues, other parts of the record could support Ms. Rice and Ms. Fischer's conclusions that the Plaintiff has marked difficulty with attention, concentration, and working at a reasonable pace.  The Plaintiff testified at his hearing before the ALJ: "I'll be working and I get an obsession.  I have to take off, go into the bathroom.  There is no telling how long I'm in there. I never lasted more than a couple of months at a job because of this." (R. 45-46.) In his "Activities of Daily Living" report, the Plaintiff wrote that he could not control the urge to do his compulsions while working.  (R. 247.)  On March 10, 2017, he reported to Ms. Fischer that he stayed in the bathroom "for hours and hours during the day because he feels he is obsessed with hair." (R. 858.) Dr. Stack, considering the "B" criteria of the listings, determined that the Plaintiff had a "marked" limitation in his ability to concentrate, persist, or maintain pace.  (R. 81.)  Though these records conflict with the ALJ's conclusion, none of them were entitled to controlling weight.  In other words, these portions of the record merely conflict with the portions that do support the ALJ's conclusion—they do not negate them.  In this situation, it was within the ALJ's purview to resolve the "[g]enuine conflicts" in the evidence and conclude that the Plaintiff's attention, concentration, and pacing were not markedly limited.  *Veino,* 312 F.3d at 588.

In addition to disagreeing with Ms. Rice and Ms. Fischer's assessments of the Plaintiff's attention, concentration, and pacing, the ALJ disagreed with the assessment that the Plaintiff "would be expected to be absent from work more than four days per month." (R. 18-19.) First, as the ALJ noted when discussing Dr. Franklin-Zitzkat's opinion, the Plaintiff was able to "commit to a regular routine for a sustained period of time," consistently attending cardiac rehab and go to

18

the gym regularly afterwards.  (R. 17-18.)  It also appears as though the Plaintiff consistently attended doctor's appointments and therapy appointments, and otherwise maintained a consistent daily routine.  Second, neither opinion provided an explanation as to why the Plaintiff would be absent from work more than four days per month.  Ms. Rice and Ms. Fischer merely wrote that the Plaintiff's "attention, focus and physical exertion would all be impacted in a full-time job" (R. 941) and that working under "any kind of stress or sudden changes will result in anxiety and contribute to pressure that can exacerbate his medical condition."  (R. 1315, 1317.)  The ALJ did not err in giving "little weight" to this portion of their assessments, since their conclusions were unsupported within the opinions themselves and unsupported by other evidence in the record.  *See Heaman v. Berryhill*, 765 F. App'x 498, 501 (2d Cir. 2019) (summary order) ("The ALJ here provided good reasons for giving the treating physicians' opinions less weight, including that their opinions were merely checkbox forms that offer little or nothing with regard to clinical findings and diagnostic results . . . ." (internal quotation marks and citation omitted)); *Holdridge v. Comm'r of Soc. Sec.*, 351 F. Supp. 3d 316, 323 (W.D.N.Y. 2018) (finding that the ALJ properly accorded little weight to the "check-box" opinions of the providers in part because they "offered no explanation as to why they arrived at the conclusions relating to Plaintiff's limitations and absenteeism.").

The ALJ also disagreed with the assessment that the Plaintiff would be "seriously limited in interacting appropriately with the public."  (R. 18.)  The ALJ noted that Third Opinion's assessment of a "serious limitation" in interacting with the public was inconsistent with Ms. Rice and Ms. Fischer's previously documented responses.  The ALJ cited to the Second Opinion, which concluded that the Plaintiff had an unlimited or very good ability to interact with the general public. (R. 943.)  In addition, the First Opinion rated the Plaintiff's ability to interact appropriately with

19

others as "excellent." (R. 753.) Given this drastic change of opinion, without any dramatic change expressed in Ms. Rice or Ms. Fischer's corresponding treatment notes, the Court concludes that the ALJ did not commit error in according little weight to it.

Finally, the ALJ disagreed with the Second Opinion's assessment that the Plaintiff was "unable to meet competitive standards" in dealing with normal work stress, and the Third Opinion's assessment that he was completely unable to deal with normal work stress. (R. 18-19.) The ALJ's determination that these assessments are inconsistent with the record is supported by substantial evidence. As previously noted, the Plaintiff's condition improved with medication and therapy. In June 2018, he told Ms. Rice that he was able to use techniques that he learned in therapy to cope with his anxiety and his other mental health symptoms. (R. 1172-73.) In May and June of 2018, he expressed an interest in opening a vape store to Ms. Fischer, who encouraged him to open the store or "find a way to get involved." (R. 1174, 1182.) Between September 2017 and January 2018, he was able to work part-time giving rides to the airport. (R. 1034, 1133, 1229.) In sum, the records sufficiently support a conclusion that the Plaintiff has at least some capacity to deal with work-related stress, since he was able to work a part-time job and even take steps towards opening his own business. The ALJ reasonably concluded that this record evidence was inconsistent with a total inability to deal with stress.

In sum, the ALJ was well within her discretion to determine that the extreme limitations assessed by Ms. Fischer and Ms. Rice were inconsistent with the overall record. Therefore, the Court finds that the ALJ properly weighed these opinions and adequately explained her reasoning for doing so. As discussed, the ALJ's decision to accord Ms. Fischer and Ms. Rice's opinions only partial weight is supported by substantial evidence on the record.

### iv.   Disability Determination Services Consultant Opinions

The ALJ assigned "great weight" to the DDS medical and psychiatric consultants at the initial level, and only "partial weight" to the DDS medical and psychiatric consultants at the reconsideration level.  (R. 19.)   The Plaintiff contends that the treating physician rule has been made to "stand on its head," as the "greatest weight was assigned to the opinions of a psychiatrist, and a physician with a specialty in Emergency Room Medicine, who never saw—let alone clinically examined"—the Plaintiff.  (ECF No. 16-2, at 18.)  Though the Plaintiff challenges the weight assigned to the opinions of both the medical and psychiatric consultants, he has not challenged any of the ALJ's conclusions about his exertional limitations.  It appears that the Psychiatric Reviews and Mental RFC Assessments done by Dr. Hill and Dr. Stack are the opinions at issue here.

The ALJ is permitted to give the opinions of non-examining sources more weight than treating or examining sources "where there is record evidence to support such a determination." *West v. Berryhill*, No. 3:17-CV-1997 (MPS), 2019 WL 211138, at *5 (D. Conn. Jan. 16, 2019) (citing *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993)).  In her decision, the ALJ explained that she assigned the opinions of the DDS consultants at the initial level significant weight because they were "consistent with the medical evidence of record that had been received at the time" and were "not inconsistent with medical evidence subsequently received." (R. 19.)  As the ALJ noted in her decision, the DDS consultants' opinions as to the Plaintiff's non-exertional limitations are consistent with the Plaintiff's improvement with treatment, activities of daily living, and the treatment notes of Ms. Rice and Ms. Fischer.  The ALJ did not err, as she adequately explained the weight that she assigned to the opinions of the DDS consultants at the initial level, and there is evidence in the record to support this determination.

The Plaintiff argues that the ALJ erred in relying on Dr. Hill's opinion because "Dr. Hill did not have before him *any* of the medical source statements that are now of Record." (ECF No. 16-2, at 20 (emphasis in original).)   Though a consultant's opinion can be found stale if subsequently submitted evidence "raise[s] doubts as to the reliability of [the consultant's] opinion," the opinion is not stale when the new records "do not differ materially" from what the consultant originally had before him.  *Camille v. Colvin*, 652 F. App'x 25, 28 n.4 (2d Cir. 2016) (summary order).  In this case, Dr. Hill had access to the consultative examination report from Dr. Franklin-Zitzkat and treatment records from the Cornell Scott Hill Health Center. (R. 60-61.)  Dr. Franklin-Zitzkat's opinion does not differ materially from any of the opinions subsequently submitted by Ms. Rice and Ms. Fischer.  All four assess the Plaintiff as having limitations related to concentration, persistence, attendance, and social interaction.  The Plaintiff does not cite to any evidence that suggests that the Plaintiff's condition has significantly changed since Dr. Hill provided his opinion.

The ALJ assigned "great weight" to the DDS medical and psychological consultants at the reconsideration level "to the extent that they [were] consistent with the [RFC] arrived at by the undersigned," and gave them less weight "to the extent that they [were] inconsistent."  (R. 19.) With the exception of assigning a "marked" limitation in concentration, persistence, and pace, Dr. Stack's assessment is functionally identical to that of Dr. Hill's.  Therefore, the ALJ did not err in assigning "great weight" to those portions consistent with Dr. Hill's assessment.  The ALJ found "little support in the record for a marked restriction" in maintaining concentration, persistence, and pace, and noted that Dr. Stack's assessment "[a]ppeared to rely heavily on the self-reported history

given to Dr. Franklin-Zitzkat during the consultative examination"[6] and "the mental status questionnaire completed by Maura Fischer, APRN." (R. 19.) As discussed in more detail *supra* Parts III.A.i & iii, the ALJ's conclusion that there is "little support in the record for a marked restriction" in maintaining concentration, persistence, and pace is supported by substantial evidence. For these reasons, the Court finds that the ALJ's decision to assign partial weight to the DDS consultants' opinions at the reconsideration level is supported by substantial evidence.

### B. The ALJ Properly Considered the Plaintiff's Severe Impairment of Body Dysmorphic Disorder

The Plaintiff argues that, even though the ALJ found that his BDD is a "severe impairment," her decision was "devoid of any discussion or analysis of the role [BDD] plays in [his] ability to work." (ECF No. 16-2, at 23.) He specifically notes that his BDD affects his ability to interact with others and his ability to concentrate, persist, and maintain pace. (*Id.*) A review of the ALJ's decision, however, shows that she explicitly took the Plaintiff's severe impairment of BDD into account when determining whether the Plaintiff met a listing at Step Three and when calculating his RFC.

At Step Three, the ALJ evaluated whether the Plaintiff met the listing for 12.04, "depressive, bipolar, and related disorders," or 12.06, "anxiety and obsessive-compulsive

---

[6]     The ALJ was entitled to consider the fact that Dr. Franklin-Zitzkat's conclusion was based on a self-reported history. "As plaintiff points out, interviewing a patient and assessing her subjective self-reported symptoms can be an acceptable diagnostic technique when the condition complained of involves a substantial subjective component. But it is true too that regardless of any inherent subjectivity in the field of psychiatry, a doctor cannot simply report what his patient says and re-package it as an opinion." *Samantha S. v. Comm'r of Soc. Sec.,* 385 F. Supp. 3d 174, 185 (N.D.N.Y. 2019) (internal quotation marks, punctuation, and citation omitted). *See also Merkley v. Comm'r of Soc. Sec.*, No. 7:16-cv-1394 (GTS), 2017 WL 4512448, at *4 (N.D.N.Y. Oct. 10, 2017) ("A source's reliance on a claimant's subjective reports rather than the medical evidence constitutes a good reason for affording less weight to a medical opinion, even from a treating physician.").

disorders."[7] (R. 13.) To meet the listing for 12.04, "depressive, bipolar, and related disorders," or 12.06, "anxiety and obsessive-compulsive disorders," the claimant must satisfy the requirements of paragraph A and paragraph B *or* paragraph A and paragraph C.  20 C.F.R. § Pt. 404, Subpt. P, App'x 1, §§ 12.04, 12.06.  To meet the paragraph B criteria, the claimant must show extreme limitation[8] of one, or marked limitation[9] of two, of the defined areas of mental functioning: "1. Understand, remember, or apply information (see 12.00E1). 2. Interact with others (see 12.00E2). 3. Concentrate, persist, or maintain pace (see 12.00E3).  4. Adapt or manage oneself (see 12.00E4)." *Id.*  The ALJ determined that none of the Plaintiff's impairments, either individually or in combination, met the listing for 12.04 or 12.06.  (R. 13.)  The ALJ found that the Plaintiff had "mild limitation"[10] in understanding, remembering, or applying information; "mild limitation" in adapting and managing oneself; "moderate limitation"[11] in interacting with others; and "moderate limitation" in concentrating, persisting, or maintaining pace.  (R. 13.)  She specifically considered the effects of the Plaintiff's BDD, noting that the Plaintiff's OCD and BDD diagnoses supported her conclusions that he was moderately limited in interacting with others and moderately limited in concentrating, persisting, and maintaining pace.  (*Id.*)

---

[7]     The Plaintiff does not argue that his impairments meet or equal any other listed impairment.

[8]     An "extreme limitation" means the claimant is "not able to function in this area independently, appropriately, effectively, and on a sustained basis."  20 C.F.R. § Pt. 404, Subpt. P, App'x 1, § 12.00F2.

[9]     A "marked limitation" means the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." *Id.*

[10]     A "mild limitation" means that the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited." *Id.*

[11]     A "moderate limitation" means that the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." *Id.*

At the next step, when calculating the Plaintiff's RFC, the ALJ considered how the Plaintiff's mental health conditions impacted his ability to work. She discussed the Plaintiff's testimony about his BDD and OCD (R. 15), his treatment for his mental health conditions (R. 16-17), his daily activities (R. 17), and each of the medical opinions submitted. (R. 17-19.) She ultimately accepted that the Plaintiff's mental health conditions affected his abilities to concentrate, persist, maintain pace, and interact with others. While some of the opinion evidence indicated that the Plaintiff had "extreme" or "marked" limitations in these areas, the ALJ properly exercised her discretion and determined that the Plaintiff's limitations were not as severe as those opinions stated. The Plaintiff disagrees with the ALJ's conclusions about the impact of his BDD (*see* ECF No. 16-2 at 14-15, 22-24), but his disagreement does not mean that the ALJ failed to consider it at all. As discussed in further detail *supra* Part III.A and *infra* Part III.C, the ALJ's conclusions about the Plaintiff's overall level of impairment are supported by substantial evidence.

## C.    The ALJ's Residual Functional Capacity Finding is Supported by Substantial Evidence

The Plaintiff categorized his criticism of the ALJ's RFC under his Step Five discussion, writing that there was "no factual underpinning for the ALJ's hypothetical question [to the vocational expert] and the identical [RFC] assessment." (ECF No. 16-2, at 15.) The Court will interpret those sections of his brief that challenge the ALJ's hypothetical question at Step Five as also challenging the ALJ's RFC finding.[12] The Plaintiff argues that the ALJ erred by failing to incorporate the limitations that she assessed at Step Three into the RFC. (ECF No. 16-2 at 15.) The Plaintiff also argues that the RFC does not properly account for the Plaintiff's non-exertional limitations "in maintaining pace, concentrating, adapting to the work place, or the ability to persist

---

[12]    *See infra* Part III.D.iii for the Court's assessment of the hypothetical question that the ALJ posed to the VE.

in simple activities without interruption from psychological symptoms." (*Id.* at 14.)  Finally, the

Plaintiff contends that the ALJ failed to properly account for his BDD in determining his RFC.

(ECF No. 16-2 at 22-24.)  The Court will address each of these arguments in turn.

**i.      The ALJ Was Not Obligated to Expressly Incorporate the Step Three
            Findings into the RFC**

Though the ALJ assessed the Plaintiff as having moderate limitations in "interacting with

others" and "concentrating, persisting, or maintaining pace" (R. 13) at Step Three, she was not

obligated to explicitly incorporate those findings into the RFC.  *See Reeves v. Comm'r of Soc. Sec.,*

No. 19-CV-775S, 2020 WL 4696589, at *3 (W.D.N.Y. Aug. 13, 2020) ("The ALJ may take the

same information finding a moderate limitation for 'paragraph B' criteria and conclude that

Plaintiff's functional capacity is not impaired by that moderate limitation."); *Poole v. Saul*, No.

3:19-CV-00927 (SALM), 2020 WL 2611230, at *16 (D. Conn. May 22, 2020) ("[A]ssessments of

limitations and restrictions from mental impairment at steps two and three are not an RFC

assessment . . . . to the extent Plaintiff contends that the ALJ was required to expressly include the

moderate limitations (in concentration, persistence and pace) identified at Step 3 in the RFC

determination, such argument lacks merit because the ALJ's findings at step 3 of the sequential

analysis are not an RFC determination . . . . .") (internal quotation marks and citations omitted).

Therefore, the ALJ did not err when she did not explicitly incorporate her Step Three findings into

the RFC determination.

**ii.     The ALJ's Failure to Expressly Account for the Plaintiff's Non-Exertional
            Limitations Was Harmless Error**

It is not *per se* error for an ALJ to formulate the RFC without explicitly including the

Plaintiff's non-exertional limitations.  In *McIntyre*, 758 F.3d at 152, the ALJ failed to incorporate

the plaintiff's limitations in maintaining concentration, persistence, and pace into the hypotheticals

that he presented to the VE.  The Second Circuit held that a failure to explicitly incorporate these limitations is harmless error if: "(1) medical evidence demonstrates that [the] claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, and the challenged hypothetical is limited to include only unskilled work; or (2) the hypothetical otherwise implicitly account[ed] for [the] claimant's limitations in concentration, persistence, and pace."  *Id.*   Though *McIntyre* specifically addressed a potential error in the hypothetical question posed to the VE, courts in this district have applied its "harmless error" standard to the RFC analyses of ALJs as well.  *See, e.g., Poole,* 2020 WL 2611230, at *16 (finding that the RFC accounted for the combined effects of the plaintiff's impairments and citing *McIntyre*); *Gonzalez v. Berryhill*, No. 3:17-CV-01385 (SALM), 2018 WL 3956495, at *16 (D. Conn. Aug. 17, 2018) (same).

In this case, the record supports a finding that the Plaintiff would be able to engage in simple, routine tasks, despite his limitations.  In the First Opinion from Ms. Rice and Ms. Fischer, they assessed the Plaintiff as having a reduced ability to perform basic activities at a reasonable pace and persist in simple activities (R. 753), but also concluded that he had a "better than average" ability to carry out single-step and multi-step instructions, and an "excellent ability" to interact appropriately with others, ask questions, and respond appropriately to authority figures.  (*Id.*)  In the Second Opinion (from Ms. Fischer only), she checked that the Plaintiff had moderate limitations in concentrating, persisting, and adapting to the workplace, and extreme limitations in maintaining pace.  (R. 940.)  Despite these limitations, she also checked that he had "unlimited or very good" abilities to remember work-like procedures; understand, remember, and carry out short and simple instructions; sustain an ordinary routine without special supervision; work in coordination or proximity to others without being unduly distracted; make simple work-related

decisions; accept instructions and criticism from a supervisor; and get along with coworkers or peers without distracting them.  (R. 942.)  In the Third Opinion from Ms. Rice and Ms. Fischer, they concluded that the Plaintiff had "extreme" limitations in maintaining pace and "marked" limitations in concentrating and adapting to the workplace (R. 1314), but also concluded that he had "unlimited or very good" abilities to understand, remember, and carry out simple instructions; ask simple questions or request assistance; and get along with co-workers without unduly distracting them.  (R. 1316.)  He also had "limited but satisfactory" abilities to sustain an ordinary routine without special supervision; work in coordination or proximity to others without being unduly distracted; and make simple work-related decisions.  (*Id.*) [13]

The treatment notes fail to show that the Plaintiff was incapable of performing simple, routine tasks that did not require teamwork or working closely with the public, or that he could not perform an occupation with occasional direct interactions with coworkers.  During sessions with Ms. Rice and Ms. Fischer, the Plaintiff consistently appeared well groomed, appropriately dressed, euthymic, and cooperative.  (R. 830, 835, 840, 845, 850, 855, 859, 864, 870, 905, 915, 922-23, 927-28, 1045, 1052, 1056-57, 1067, 1074, 1086, 1093, 1101, 1117, 1127, 1138-39, 1143-44, 1150, 1175, 1179-80, 1183, 1191, 1198-99, 1202, 1209-10, 1217, 1221-22, 1235.)  He had normal attention, intact memory, average intelligence and speech, good or age appropriate impulse control, logical thought content, and good insight and judgment.  (R. 830-31, 835-36, 840-41, 850-51, 855-56, 859-60, 864-65, 870-71, 905-06, 915-16, 922-23, 927-28, 1045-46, 1052-53, 1056-57, 1067-68, 1074-75, 1086-87, 1093-94, 1101-02, 1117-18, 1127-28, 1138-39, 1143-44, 1150-51,

---

[13]    To be sure, the ALJ discounted several portions of these opinions—significantly, the portions that assessed the Plaintiff as having marked and/or severe non-exertional limitations.  The Court cites them only to show that even those opinions that assessed the Plaintiff as having severe non-exertional limitations concluded that the Plaintiff could still perform simple, routine, unskilled tasks.

1175-76, 1179-80, 1183-84, 1191-92, 1198-99, 1202-03, 1209-10, 1217-18, 1221-22, 1235-36.) His symptoms improved with medication and therapy.  (R. 844, 1094-95, 1102, 1171-72.)

The record also shows that the Plaintiff was able to independently engage in his activities of daily living. "The ALJ's findings that the claimant is independent in . . . activities of daily living . . .  support the ALJ's conclusion that Plaintiff can engage in simple, routine, low stress tasks . . ." *Jimenez v. Colvin*, No. 12-CV-6001 (PGG/FM), 2016 WL 5660322, at *12 (S.D.N.Y. Sept. 30, 2016) (internal quotation marks and citations omitted)). In his Activities of Daily Living Report from June 4, 2017, the Plaintiff wrote that he was able to take care of his dog, help his grandparents with daily tasks and doctor's appointments, shop for food for two hours every week, do household chores, drive, and go out daily.  (R. 240-246.)  He was able to work part time, giving rides at the airport from at least September 2017 to January 2018.  (R. 1034, 1133, 1229.)  In February 2018, he told Dr. Oen-Hsiao that he was exercising at the gym every day, walking three miles of cardio and lifting weights.  (R. 1017-18.)  In June 2018, the Plaintiff told Ms. Fischer that he wanted to open a vape store but was having difficulty finding reasonably priced store space.  (R. 1174.)  That same month, Ms. Rice reported that the Plaintiff had made significant progress in his treatment plan and was attending weekly group therapy.  (R. 1171-72.)

Even if the record had not shown that the Plaintiff is capable of performing simple, routine tasks, the ALJ's RFC implicitly accounted for his limitations in concentration, persistence, maintaining pace, and adapting to the workplace.  While the ALJ did not explicitly state that any of these limitations were adopted, or explicitly include them in the RFC, an ALJ is not required to recite "every piece of evidence" that contributed to her decision when the record allows the reviewing court to understand the rationale behind it. *Cichocki*, 729 F.3d at 172 n.3.  The ALJ's rationale is clearly discernable.  After her extensive review of the record, she concluded that the

Plaintiff was limited in these areas, but that the degree of limitation was no more than mild to moderate.[14]  By limiting the Plaintiff to simple, routine tasks that did not require teamwork or working closely with the public, the ALJ properly accounted for moderate limitations in attention, concentration, and pace and mild limitations in adapting or managing oneself.  *See, e.g., Handau v. Saul*, No. 3:19-CV-616 (RMS), 2020 WL 4218229, at *16 (D. Conn. July 23, 2020) (finding that the ALJ accounted for the plaintiff's moderate limitations in maintaining attention, concentration, and pace and mild limitations in adapting or managing herself "by concluding that she was limited to simple, routine repetitive work that did not require teamwork or working closely with the public and required only occasional interaction with coworkers, supervisors and the public"); *Campos v. Saul*, No. 18-CV-9809 (DF), 2020 WL 1285113, at *23 (S.D.N.Y. Mar. 18, 2020) (finding that the ALJ "impliedly account[ed] for the restrictions in concentration, pace,

---

[14]     At Step Three, the ALJ concluded that the Plaintiff had a moderate limitation in concentration, persistence, and pace. (R. 13.) This conclusion is supported by substantial evidence in the record.  *See* Parts III.A & B.  The ALJ also concluded that the Plaintiff had only a mild limitation in adapting and managing himself, which was "supported by the claimant receiving assistance with handling excessive worry through his individual counseling sessions." (R. 13.) There is substantial evidence on the record that supports the ALJ's assessment and contradicts the Plaintiff's claim of a "marked" limitation in adapting and managing himself in the workplace. This evidence includes:  The Plaintiff's attempts in 2018 to open a vape store (R. 17); the Plaintiff's work activity giving rides at the airport (R. 17); the fact that medication and therapy appeared to be successful in improving his impairments (*id.*); the opinion of consultative examiner Dr. Franklin-Zitzkat that the Plaintiff "should be able to adapt to changes" so long as his assessed mental health limitations did not interfere (R. 17, 739); the opinions of the DDS psychological consultants, Dr. Hill and Dr. Stack (R. 63-84, 67-69, 81, 85-87); the impairment questionnaire dated June 9, 2017, where Ms. Rice and Ms. Fischer opined that the Plaintiff had "much better than average" abilities to use good judgment regarding safety and dangerous circumstances, use appropriate coping skills, and handle frustration appropriately (R. 18, 752); records showing that the Plaintiff was capable of using coping strategies to deal with anxiety and other symptoms (R. 1172-73); and treatment records showing that the Plaintiff consistently appeared euthymic and demonstrated good insight and judgment.  (R. 830-31, 835-36, 840-41, 850-51, 855-56, 859-60, 864-65, 870-71, 905-06, 915-16, 922-23, 927-28, 1045-46, 1052-53, 1056-57, 1067-68, 1074-75, 1086-87, 1093-94, 1101-02, 1117-18, 1127-28, 1138-39, 1143-44, 1150-51, 1175-76, 1179-80, 1183-84, 1191-92, 1198-99, 1202-03, 1209-10, 1217-18, 1221-22, 1235-36.)

and persistence" by "incorporating the restriction to simple, routine tasks, occasional contact with supervisors, and no contact with the general public"); *Hill v. Comm'r of Soc. Sec.*, No. 18-CV-1161L, 2020 WL 836386, at \*4-5 (W.D.N.Y. Feb. 20, 2020) (finding that limiting the plaintiff to "performing simple, routine and repetitive tasks, and simple work-related decisions, and to only occasional interaction with coworkers and the public" adequately accommodates for even marked limitations in adapting or managing oneself); *Herb v. Comm'r of Soc. Sec.*, 366 F. Supp. 3d 441, 447 (W.D.N.Y. 2019) ("[A]n RFC limiting a plaintiff to occasional interaction with co-workers and the public, and to the performance of simple, routine tasks, may account for the plaintiff's stress-related limitations.").

In sum, the record adequately supports that the Plaintiff would be able to engage in simple, routine activities despite his limitations.  This conclusion is supported by the opinion evidence submitted by Ms. Rice and Ms. Fischer, the treatment notes, and the Plaintiff's activities of daily living.  Additionally, the ALJ's RFC implicitly accounted for the Plaintiff's non-exertional limitations.  Therefore, any error in failing to explicitly incorporate these limitations into the RFC was harmless.

### iii.    The ALJ Did Not Err by Not Incorporating the Plaintiff's Subjective Complaints Into the RFC

The Plaintiff also argues that the RFC did not sufficiently incorporate all the functional limitations created by his BDD.  He states that his BDD, specifically, "play[s] a role in his inability to concentrate, persist, or maintain pace" (ECF No. 16-2 at 22), limits his ability to interact with others, and "would take him off-task for more than 10% of the workday . . . ." (ECF No. 16-2 at 22-24.)  As discussed in detail *supra* Part III.C.ii, any error in failing to explicitly incorporate the Plaintiff's limitations in concentration, persistence, and maintaining pace was harmless.  The Plaintiff's BDD does not add any new dimension to the evaluation, as all the providers and

consultants who provided opinions were aware of his BDD and the effect that it had on his concentration, persistence, and pace.  Regarding the Plaintiff's limitations in his ability to interact with others, the ALJ concluded at Step Three that the Plaintiff's OCD and BDD moderately limit his ability to interact with others (R. 13), though she also found that he could "relate appropriately with others."  (R. 14.)  She properly accounted for a moderate limitation in the Plaintiff's ability to interact with others by finding that he is limited to "occasional direct interactions," he "needs to do tasks alone rather than in groups or teams," and he is to have "no work with the general public." (*Id.*)  *See, e.g., Reilly v. Colvin,* No. 1:13-cv-00785 (MAT), 2015 WL 6674955, at *3 (W.D.N.Y. Nov. 2, 2015) ("[G]enerally a limitation to only 'occasional' or 'limited' contact with others has been found sufficient to account for moderate limitations in social functioning.").

The Plaintiff also argues that the ALJ did not properly account for his BDD-related off-task behavior, which is "highly significant given [the VE's] testimony that an employer would not tolerate more than 10% off task behavior by an employee."  (ECF No. 16-2, at 15.)  There is no medical opinion or record stating that the Plaintiff's BDD would render him off-task for more than 10% of the workday.[15]  The Plaintiff instead attempts an appeal to common sense, stating that because he checks his reflection in a mirror "between twenty and one hundred times a day" due to his BDD, "it seems obvious that this would take [him] off-task for more than 10% of a

---

[15]      The only statements from medical sources about the Plaintiff's BDD-related mirror compulsion come from Ms. Fischer and Dr. Franklin-Zitzkat.  On March 10, 2017, Ms. Fischer made a chart entry stating that the Plaintiff "has been looking in the mirror 100 times every day for about twenty years," that Lexapro provides "some relief" from his BDD symptoms, that he sometimes stays in the bathroom for two hours, and that the "behavior has actually improved from a few years ago when behaviors were more extreme."  (R. 858-859.)  Dr. Franklin-Zitzkat wrote that the Plaintiff goes to the mirror "[twenty] times a day . . . He was never able to keep an office job because he would repeatedly leave his post to check the mirror, and he would have difficulty concentrating on his work because he was so focused on a perceived flaw.  Some days he called out sick because he could not break away from the mirror.  He was fired from jobs as a result." (R. 737.)

workday. . . ."  (ECF No. 16-2).  Essentially, the Plaintiff is contending that the ALJ did not properly consider and incorporate these subjective complaints into the RFC.  While the ALJ was obliged to consider the Plaintiff's subjective complaints when formulating the RFC, she was "not required to accept the claimant's subjective complaints without question; [s]he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).

The credibility findings of an ALJ "are entitled to great deference and therefore can be reversed only if they are patently unreasonable." *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (internal quotation marks omitted).  In evaluating a plaintiff's credibility, the ALJ must first determine whether the plaintiff has a "medically determinable impairment that could reasonably be expected to produce [the plaintiff's] symptoms, such as pain." 20 C.F.R. § 416.929(b).  The ALJ must then assess the credibility of the plaintiff's complaints regarding "the intensity and persistence of [the plaintiff's] symptoms" to "determine how [the] symptoms limit [the plaintiff's] capacity for work." 20 C.F.R. § 416.929(c); *see also* SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017).

In this case, the ALJ expressly took the Plaintiff's subjective complaints about BDD and OCD into account, finding that his "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that his subjective statements "concerning the intensity, persistence, and limiting effects of these symptoms [were] not fully consistent" with the evidence in the record.  (R. 15.)  In accordance with SSR 16-3p, the ALJ considered the Plaintiff's treatment notes, his daily activities, the "primarily successful" treatments for his impairments, and his part-time work activities.  (R. 16-17.)  After considering this evidence, the ALJ concluded that the Plaintiff's symptoms "do not limit his activities to the extent alleged."  (R. 17.)  Because the

ALJ specifically addressed the Plaintiff's subjective complaints in accordance with the regulations, she "was entitled to make a credibility determination regarding [the Plaintiff's] allegations . . . ." *Jordan v. Barnhart*, 29 F. App'x 790, 794 (2d Cir. 2002) (summary order).

The ALJ did not commit error when she evaluated the Plaintiff's credibility and found that his BDD symptoms, among others, did not limit him to the extent that he alleged.  Therefore, the ALJ did not err when she failed expressly to include any "off-task" behavior limitations into the RFC.  "[The Plaintiff] had a duty to prove a more restrictive RFC, and failed to do so." *Smith,* 740 F. App'x at 726.  *See also Barry v. Colvin*, 606 F. App'x 621, 622 (2d Cir. 2015) (summary order) ("A lack of supporting evidence on a matter for which the claimant bears the burden of proof, particularly when coupled with other inconsistent record evidence, can constitute substantial evidence supporting a denial of benefits.").

### iv.       Conclusion

Although the ALJ's ultimate RFC determination does not fully adopt any single medical opinion, she is entitled to weigh all of the evidence available to make an RFC finding that is consistent with the record as a whole. *See Richardson v. Perales,* 402 U.S. 389, 399 (1971) ("We therefore are presented with the not uncommon situation of conflicting medical evidence.  The trier of fact has the duty to resolve that conflict.").  The ALJ weighed the opinion evidence in accordance with the regulations and her conclusions are supported by substantial evidence in the record as a whole.  Based on the foregoing reasons, the RFC finding is free from legal error and supported by substantial evidence and should not be disturbed.

**D.      The ALJ's Step Five Findings Are Supported by Substantial Evidence**

**i.      The ALJ's Failure to Resolve an Apparent Inconsistency Between the Dictionary of Occupational Titles and the Vocational Expert's Testimony Was Harmless Error**

When assessing whether a claimant can do a job, regardless of his limitations, the ALJ looks to the Dictionary of Occupational Titles ("DOT"), the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO"), and the testimony of VEs.  "In making disability determinations, [the adjudicator] rel[ies] primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy . . . . [the adjudicator] may also use VEs. . . to resolve complex vocational issues."  SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000).[16] If there is any conflict between the VE's testimony and the DOT, the ALJ "has an affirmative responsibility to ask about any possible conflict between that VE or [vocational specialist ("VS")] evidence and information provided in the DOT." *Id.* at *4.  The ALJ must resolve any conflict between the VE's testimony and the DOT before relying on the VE's testimony.  "When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence . . . ." *Id.*  "[T]he Ruling requires the Commissioner to 'obtain a reasonable explanation' for any '*apparent*'—even if non-obvious—conflict between the *Dictionary* and a [VE's] testimony."  *Lockwood,* 914 F.3d at 92 (emphasis in original).  *See also Martin v. Saul*, No. 3:18-CV-00914 (SALM), 2019 WL 3852580, at *8 (D. Conn. Aug. 16, 2019)

---

[16]      Even though this Social Security Administration Policy Interpretation Ruling was published in 2000, the ruling still governs the Commissioner's Step Four and Five assessment. *See Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87, 91 (2d Cir. 2019) (finding that SSR 00-4p still "governs the Commissioner's assessment of whether any particular job can accommodate a given claimant's physical limitations").

("[A]n ALJ must not only identify and inquire into any apparent conflicts, but must *actually resolve* such conflicts . . . ." (emphasis in original)).

When the ALJ fails to resolve apparent conflicts between the VE's testimony and the DOT, the court may remand and direct the ALJ to resolve the conflict. "Where the ALJ does not fully discharge his duty to resolve any apparent conflicts between the VE's testimony and the DOT, remand is appropriate." *Martin*, 2019 WL 3852580, at *8. Here, the Plaintiff argues that the testimony of the VE conflicted with three DOT codes: 529.665-014, "Washroom Operator," 921.685-046, "Fruit Distributor," and 302.685-010, "Domestic Laundry Worker. (ECF No. 16-2, at 4.)[17] He states that the alleged conflicts between the DOT and Dr. Soldner's testimony were "neither acknowledged nor explained" by the ALJ, a failure warranting remand. (*Id.* at 3-7.)

DOT Code 529.665-014, "Washroom Operator," is defined as a worker that "tends beet washing equipment and elevators that clean sugar beets . . . starts elevators and washing equipment . . . Turns valves to drain water from washing vat. Cleans debris from vat, using water hose." The VE identified this job as one "in a warehouse or some sort of facility for cleaning . . . Involves being [in] a factory where washing equipment would be present." (R. 55.) It is unclear why the Plaintiff's counsel sees the VE's testimony as conflicting with this description. The fact that the job involves "only the washing vats for sugar beets" does not conflict with the testimony. The washing vats for sugar beets could be in a warehouse or "some sort of facility for cleaning," and the washing vats themselves qualify as the washing equipment that would be present. In any event, the ALJ did not rely on this testimony to reach her decision (R. 21), since the VE also testified that

---

[17]     The Plaintiff does not appear to be contesting the validity of the VE's testimony with regards to DOT Code 920.687-126, "Marker II." (ECF No. 16-2, at 4.)

the environmental hazards of the job "would preclude this work based on the judge's hypothetical." (R. 55.)

DOT Code 921.685-046, "Fruit Distributor," is defined as a worker that "[t]ends conveyor to distribute citrus fruit to packers' work stations . . . ." The VE testified that the "job setting typically" of a fruit distributor is a warehouse. (R. 56.) The Plaintiff argues that the DOT definition "makes clear, this is an occupation performed in a fruit packing plant, not a warehouse." (ECF No. 16-2, at 4.) Again, it is unclear why the Plaintiff believes that the VE's testimony conflicts with this DOT definition, because the DOT description does not say anything about the type of building that the job is performed in. The Plaintiff also argues in a footnote that the Fruit Distributor job does not fit within the ALJ's hypothetical, since it requires working with "open, fast moving parts and, arguably, unprotected heights (catwalks)." (*Id.*) According to the SCO, the Fruit Distributor job requires occasional reaching and handling and frequent near acuity/far acuity. *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*, at 124. The job also has a "loud" noise intensity level. *Id.* The environmental conditions of "proximity to moving mechanical parts" and "working in high exposed places" are not present. *Id.* Therefore, the Fruit Distributor job fits within the limitations set by the ALJ's hypothetical.

DOT Code 302.685-010, "Domestic Laundry Worker," is defined as a worker who sorts, washes, irons, and dries laundry as a domestic servant. The VE testified that a Domestic Laundry Worker is a "person working in a laundromat or dry cleaning facility." (R. 55.) The Plaintiff argues that the testimony conflicts with the DOT because the Domestic Laundry Worker works as a "laundress in a private home—not at a laundromat or dry cleaner." (ECF No. 16-2, at 4-5.) The Commissioner argues that "[t]he DOT describes the duties of a domestic laundry worker without precluding that those activities could be performed in a laundromat or dry-cleaning facility, as the

VE testified." (ECF No. 19-1, at 12.) The Court concludes that VE's statement that the "Domestic Laundry Worker" works in a dry-cleaning facility conflicts with the DOT. Typical private households do not have their own dry-cleaning facilities and a private household worker would not be permitted to dry clean clothes at an existing facility. Significantly, DOT Codes 362.382-014, "Dry Cleaner" and 362.684-010 "Dry Cleaner, Hand" both require a medium strength rating, but the ALJ held that the Plaintiff only has the RFC to perform light work. (R. 14.) Because the VE apparently conflated "Domestic Laundry Worker" with "Dry Cleaner," the Court cannot determine whether there are 7,000 domestic laundry worker jobs or 7,000 dry cleaner jobs in the national economy. The ALJ did not resolve this apparent conflict.

Though the ALJ should have resolved this, her error was harmless. An ALJ's failure to inquire into a potential conflict may be considered "harmless error" when the unconflicted parts of the VE's testimony supported the ALJ's conclusions. *See Saez v. Saul*, 3:18-cv-2061 (SRU), 2020 WL 2572770, at *8-9 (D. Conn. May 20, 2020) (finding that there was unresolved conflict between VE's testimony and the DOT with respect to two of the jobs identified by the VE, but holding that the error was harmless because the VE resolved the conflict with respect to the third job); *Salati v. Saul*, 415 F. Supp. 3d 433, 448 (S.D.N.Y. 2019) ("Because the VE identified multiple jobs that exist in significant numbers in the national economy that a hypothetical individual with [the plaintiff's] limitations could perform . . . . and there is no evidence that a person with those limitations could not perform those jobs, [the plaintiff's] argument does not provide a ground for remand."); *Richardson v. Berryhill*, No. 3:18-CV-00448 (KAD), 2019 WL 4764834, at *9 (D. Conn. Sept. 30, 2019) ("[E]ven if a conflict [between the vocational expert's testimony and the DOT] might be perceived and the ALJ erred by not making inquiry in this regard, such error would be harmless because the ALJ identified two other jobs that an individual with the

Plaintiff's RFC could perform and that exist in significant numbers in the national economy."). Here, the VE provided the ALJ with the jobs of Fruit Distributor and Marker II, jobs that a claimant with the Plaintiff's RFC could perform. The VE testified that there are 76,000 Marker II jobs and 27,000 Fruit Distributor jobs in the national economy. (R. 64.) "The Commissioner need show only one job existing in the national economy that [the plaintiff] can perform." *Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir. 2011) (summary order). Because the error is harmless, remand is not warranted to address it.

### ii. The Vocational Expert's Testimony Constitutes Substantial Evidence

The Plaintiff takes issue with the fact that "*at no time* did [the VE] identify the sources of his job incidence testimony," since "[t]he vocational witness *must of necessity* turn to some other source or combination of sources to provide information regarding the availability of jobs." (ECF No. 16-2, at 7 (emphasis in original).) The Plaintiff argues that, because the VE did not provide his sources of job incidence data, his testimony was insufficient to serve as a basis for the ALJ's Step Five findings. (*Id.* at 9.) The Commissioner argues that "there is no requirement that the ALJ inquire as to the precise basis for the VE's testimony regarding extra-DOT information" and, furthermore, that the Plaintiff waived review of this issue by failing to raise it at the hearing and before the Appeals Council. (ECF No. 19-1, at 13.)

The Plaintiff relies on *Hernandez v. Berryhill*, 3:17-cv-368 (SRU), 2018 WL 1532609 (D. Conn. Mar. 29, 2018) to support his argument. In *Hernandez*, the court found that there needs to be "some evidentiary basis" for the ALJ to rely on the opinions of VEs. *Id.* at *14. The court concluded that "[i]t is enough for a vocational expert to identify the sources he generally consulted to determine the availability of jobs, even if he does not provide specific information." *Hernandez*, 2018 WL 1532609, at *14 (internal quotation marks omitted) (citing *Brault v. Comm'r of Social*

*Security*, 683 F.3d 443, 450 (2d Cir. 2012)).  The VE's testimony was inadequate because the VE did not identify the "publications or sources that he used in coming to such a determination.  He mentioned only the DOT which simply defines jobs, and does not provide information regarding the number available.  By failing to identify any sources that he consulted, even generally, in determining the availability of jobs, the vocational expert's testimony did not comport with the Second Circuit's standard that he cite the sources used in coming to such a determination." *Id.* at *15.  But *Hernandez* precedes *Biestek v. Berryhill*, 139 S.Ct. 1148 (2019), wherein the Supreme Court addressed the issue of whether a VE's testimony can still be substantial evidence when the VE fails to produce the sources she used to reach her conclusion.  The Supreme Court ultimately held that a VE is not obligated to produce all the data that she considered and, absent any demand for the VE's sources, "a vocational expert's testimony may count as substantial evidence even when unaccompanied by supporting data." *Id.* at 1154-55.

Under the precedent set by *Biestek*, courts should not impose a "categorical rule" where the VE must produce underlying data for her testimony to be considered substantial evidence.  *See id. at* 1157.  Instead, courts must decide whether the testimony counts as substantial evidence on a case-by-case basis.  *Id.* "Sometimes an expert's withholding of such data, when combined with other aspects of the record, will prevent her testimony from qualifying as substantial evidence. . . . The inquiry, as is usually true in determining the substantiality of evidence, is case-by-case.  It takes into account all features of the vocational expert's testimony, as well as the rest of the administrative record.  And in so doing, it defers to the presiding ALJ, who has seen the hearing up close." *Id.* (citation omitted).  When making this determination, courts may look to "[t]he vocational expert's credentials, history of testimony, her ability to answer the ALJ and attorney's questions, and the alleged basis for her testimony . . . ." *Travo v. Saul*, No. 3:19-CV-1335 (RAR),

2020 WL 3888003, at *10 (D. Conn. July 10, 2020).  The VE's sources (or lack thereof) are a factor in determining whether her testimony is reliable, but not a deciding one.  *See Streich v. Berryhill*, No. 3:18-CV-01977 (RAR), 2020 WL 563373, at *6 (D. Conn. Feb. 5, 2020) ("The ALJ relied on [the expert's] testimony despite his failure to provide a source for his testimony. Plaintiff's counsel did not object to [the expert's] qualifications or to the number of jobs while at the hearing. . . . [The expert's] failure to provide a source for the number of jobs in the economy does not dispel the existence of substantial evidence.") (internal quotation marks and citations omitted).

The Plaintiff argues that the Court must by necessity be privy to the VE's methodology, since "the Court reviews the entirety of a VE's testimony, including the expert's methods, to make sure it rose to the level of 'substantial' evidence.  *Biestek v. Berryhill* is not to the contrary."  (ECF No. 16-2 at 9.)  He argues that his case differs from *Biestek* because the issue of unidentified sources simply "did not arise . . . . [as] the vocational witness's job incidence data came from the Bureau of Labor Statistics and her own individual labor market surveys" (*Id.* at 9 n.14 (internal quotation marks omitted)),[18]  though the VE in *Biestek* refused to provide the surveys.  Phrased differently, the Plaintiff is asking this Court to impose a categorical rule that a VE's testimony is not substantial evidence when the VE's sources are *unidentified*, because the Supreme Court only

---

[18]     The Supreme Court was made aware of the VE's source of job incidence data because Biestek's attorney had cross-examined the VE during the hearing before the ALJ.  "On cross-examination, Biestek's attorney asked [the vocational expert] 'where [she was] getting those [numbers] from.'  [The vocational expert] replied that they came from the Bureau of Labor Statistics and her 'own individual labor market surveys.'" *Biestek*, 139 S. Ct. at 1153.  In this case, the Plaintiff's then-counsel made no attempt to ascertain or obtain the VE's sources.  The Plaintiff seeks to distinguish his case from *Biestek*, but fails to acknowledge that the difference is attributable, at least in part, to his counsel's failure to cross-examine [the VE] when given the opportunity to do so.

refused to impose a categorical rule when the VE's sources were *identified* but she refused to disclose them.

Although the Plaintiff is technically correct in stating that *Biestek* is not factually identical, he does not provide any reason why a categorical rule would be justified in one circumstance but not the other. In one case, a VE testifies during cross-examination that her job incidence numbers are based on the Bureau of Labor Statistics and "her own individual labor market surveys," but refuses to provide the surveys. *Biestek*, 139 S. Ct. at 1153. The reviewing court should evaluate the entirety of her testimony, deferring to the presiding ALJ, since this testimony could still be substantial evidence. *Id.* at 1157. In the other case, the VE testifies about job incidence numbers, does not identify the sources of his data, and the plaintiff's attorney does not cross-examine him. By the Plaintiff's reasoning, this is distinguishable in his favor and warrants immediate remand by the reviewing court, with no deference given to the ALJ's opinion. Yet this kind of arbitrary distinction is clearly not what the Supreme Court intended when it determined that the proper inquiry, "as is usually true in determining the substantiality of evidence, is case-by-case." *Id.*

Other courts in this district have held, post-*Biestek*, that a VE does not need to provide her sources for job incidence data. In *Crespo v. Commissioner of Social Security*, 3:18-cv-00435 (JAM), 2019 WL 4686763, at *8 (D. Conn. Sept. 25, 2019), the VE cited only the DOT as the source of her job incidence testimony, and cited to no source for the job incidence numbers. Crespo's representative was given the opportunity to question the VE, but the representative did not challenge the VE's testimony about job incident numbers. *Id.* The court undertook the "case-by-case analysis" required by *Biestek* and concluded that "the vocational expert's failure to identify the sources of her job-numbers data does not dispel the existence of substantial evidence for the ALJ's conclusion that [the plaintiff] could perform a substantial number of jobs that existed in the

national economy."[19]  *Id.*  at *9.  *See also Melendez v. Berryhill,* No. 3:19-CV-0732 (RAR), 2020

WL 3888032, at *9 (D. Conn. July 10, 2020) (same); *Ramos v. Berryhill,* No. 3:18-CV-1082

(VAB), 2019 WL 3543659, at *10 (D. Conn. Aug. 5, 2019) (same).  The Plaintiff further argues

that reliance on *Crespo* would be "misplaced" because there is a "significant conflict of evidence"

between the VE's testimony and the DOT, essentially rendering the testimony unreliable. (ECF

No. 16-2, at 8-9.)  But, as discussed *supra* Part III.D.i, there is not a "significant conflict" between

the VE's testimony and the DOT.

 The Plaintiff also argues that the VE's testimony was not reliable or substantial because

the testimony contains a "mathematical impossibility," and "testimony that cannot by definition

be true cannot be either reliable nor substantial."  (ECF No. 16-2, at 11.)  This "mathematical

impossibility" is based on his research from the Bureau of Labor Statistics.  The VE testified that

there were 27,000 "Fruit Distributor, [DOT] 921.685-046" jobs available in the national economy.

According to the Plaintiff's brief, the "Fruit Distributor" job is within SOC 53-7011.00.  (ECF No.

---

[19]    The Plaintiff takes issue with *Crespo's* ruling, stating that *Crespo* "and its progeny pay
insufficient heed" to the fact that the burden is on the Commissioner at Step Five, and arguing that
the burden cannot be met through testimony that is based on an undisclosed methodology.  (ECF
No. 16-2, at 8-9.)  While the Commissioner does carry the burden at Step Five, that burden is not
to convince the *plaintiff* that there are jobs available in the economy that the plaintiff can do.  The
Commissioner brings forth an expert to convince the *ALJ* that there are jobs available in the
economy that the plaintiff can do.  Like any proceeding before a decisionmaker, the plaintiff may
"probe the strength" of the expert's testimony by cross-examining the expert and asking "about
(for example) her sources and methods—where she got the information at issue and how she
analyzed it and derived her conclusions."  *Biestek*, 139 S. Ct. at 1156.  Then, "[a]s the Supreme
Court has held, the ALJ determines whether the [VE's] testimony is reliable."  *Travo*, 2020 WL
3888003, at *11.  This court's role is to review that decision under "the deferential substantial-
evidence standard."  *Biestek*, 139 S. Ct. at 1156.  This is a case-by-case evaluation, "tak[ing] into
account all features of the vocational expert's testimony, as well as the rest of the administrative
record" and "defer[ring] to the presiding ALJ, who has seen the hearing up close."  *Id.* at 1157.
*Crespo* and its "progeny" did not pay "insufficient heed" to the Commissioner's burden.  The ALJs
had already found that the Commissioner had met their burden, and the district courts looked to
the record and deferred to the presiding ALJ—as the Supreme Court has directed them to do.

16-2, at 12.)  "[T]he Bureau of Labor Statistics (acknowledged as reliable) reported that for all [thirty] occupations in SOC 53-7011.00 as a whole national job incidence was 26,570.  If all [thirty] occupations together were responsible for 26,570 jobs, it is mathematically impossible for one of those [thirty] occupations to account for 27,000 jobs."  (*Id.*)

Though the Bureau of Labor Statistics has been acknowledged as a reliable source, there is " no basis on which to conclude that the [independent online research] of counsel is somehow inherently more reliable than the expert testimony . . . ."  *Poole,* 2020 WL 2611230, at *19 (quoting *Mott v. Saul,* 3:19-cv-00733 (SALM), ECF No. 24, slip op. (D. Conn. Feb. 24, 2020)).  The VE's failure to cite to the Plaintiff's preferred source does not prevent the VE's testimony from clearing the "relatively low substantial evidence bar."  *Id.* at *19-20.  Additionally, based on the Court's review of publicly available court decisions, ALJs often accept a "wide variety of job numbers" for the occupations at issue.  In this case, the Plaintiff specifically challenges the job incidence numbers for the Fruit Distributor occupation, DOT Code 921.685-046.  The Court has found decisions reporting national job incidence numbers ranging between 6,636 and 70,000 for this occupation. *See Christmas v. Comm'r of Soc. Sec.,* No. 2:17-CV-87 (FTM/MRM), 2018 WL 564548, at *4 (M.D. Fla. Jan. 26, 2018) (40,000); *Nance v. Berryhill*, No. 2:16-CV-02165, 2017 WL 2728437, at *2 (W.D. Ark. June 23, 2017*), report and recommendation adopted*, No. 2:16-CV-02165, 2017 WL 2734091 (W.D. Ark. June 23, 2017) (6,636); *O'Mary v. Berryhill*, No. CV 16-0245 (KBM), 2017 WL 2392502, at *11 (D.N.M. May 26, 2017) (39,000); *Eakins v. Colvin*, No. CV 15-2186, 2016 WL 8456746, at *3 (W.D. La. Dec. 6, 2016) (34,000); *Wyman v. Colvin*, No. CV 15-5721 (JBS), 2016 WL 9446650, at *4 (D.N.J. Aug. 1, 2016) (70,000); *McMillin v. Colvin,* No. 14-4107-CV-C-REL-SSA, 2015 WL 3447836, at *17 (W.D. Mo. May 29, 2015)

(51,283).  The job incidence number identified by the VE, 27,000, is well within this range. Indeed, the number appears to be on the low end of the range.

As to the job of Marker II, DOT Code 920.687-126,[20] the Court found decisions reporting national job incidence numbers ranging between 25,000 and 170,000.  *See Crawley v. Saul*, No. CV 19-10741 (FLW), 2020 WL 4333759, at *5 (D.N.J. July 27, 2020) (100,000); *Webb v. Saul*, No. 3:18-CV-1058, 2020 WL 419368, at *3 (W.D. La. Jan. 27, 2020) (28,000); *Atkins v. Comm'r of Soc. Sec.,* No. 3:19-CV-142-J (MAP), 2019 WL 6838512, at *2 (M.D. Fla. Dec. 16, 2019) (73,602); *Littlejohn v. Comm'r of Soc. Sec.,* No. 2:18-CV-530, 2019 WL 3712003, at *5 (S.D. Ohio Aug. 7, 2019), *report and recommendation adopted,* No. 2:18-CV-530, 2019 WL 3997434 (S.D. Ohio Aug. 23, 2019) (66,000); *Perry v. Berryhill*, No. CV 18-01441-AS, 2018 WL 6198457, at *2 (C.D. Cal. Nov. 28, 2018) (25,000); *Hills v. Comm'r of Soc. Sec.*, No. 16-CV-3959 (JFB), 2017 WL 2894131, at *5 (E.D.N.Y. July 7, 2017) (170,000); *Santiago v. Colvin*, No. 15-CV-0949 (KBF), 2016 WL 2858891, at *4 (S.D.N.Y. May 16, 2016) (170,000).  The job incidence number identified by the VE, 76,000, is well within this range.

The VE's job incidence numbers for both Fruit Distributor and Marker II are well within the range of numbers adopted by other judges.  Accordingly, the Court declines to find that the Plaintiff's independent online research serves to undermine the VE's testimony and credibility.

---

[20]     The DOT Code was mistakenly identified, in both the expert's testimony and the briefs, as DOT Code 920.667-126, "Marker II."  There is no such code.  The "Marker II" DOT code is 920.687-126.  This error is *de minimis*.  *See, e.g., Williams v. Astrue,* No. 11-CV-023S, 2012 WL 1113393, at *3 (W.D.N.Y. Mar. 30, 2012) ("[The VE] was discussing the job of a parking lot attendant and referred to a code—ending in "014" instead of "010"—that does not exist in the DOT. [Claimant] does not argue that such a mistake prejudiced him, but that this mistake calls into question the accuracy of [the expert's] entire testimony. But such a *de minimis,* inconsequential mistake hardly renders [the expert's] testimony or [the ALJ's] reliance thereon suspect." (citations omitted)).

### iii.         The Hypothetical Question Was Not Defective

The Plaintiff argues that "[t]he ALJ's failure to account in an adequate manner for [his] deficiencies in concentrating, persisting, or maintaining pace in the hypothetical question to the vocational witness constituted prejudicial error." (ECF No. 16-2, at 17.)  He specifically points to the fact that the VE testified that an employer would not tolerate any more than ten percent off-task behavior.  (ECF No. 16-2, at 15; R. 53-54.)  While an ALJ's hypothetical question to a VE "should explicitly incorporate any limitations in concentration, persistence, and pace," *McIntyre*, 758 F.3d at 151, any failure to do so in this case was harmless.  Substantial evidence in the record demonstrates that the Plaintiff can do simple, routine tasks despite his impairments.  (*See supra* Part III.C.ii.)  In addition, the hypothetical question, which is essentially identical to the RFC that the ALJ assessed (*compare* R. 14 *with* R. 52-55), implicitly accounted for the Plaintiff's limitations.  (*See supra* Part III.C.ii.)

Though the VE testified that an employer would not tolerate any more than ten percent off-task behavior from an employee (R. 53-54), the ALJ did not incorporate any off-task behavior restrictions into the RFC.  As discussed *supra* Part III.C.iii, she was not required to accept the Plaintiff's subjective complaints about his BDD.  Therefore, the hypothetical question that the ALJ posed to the VE was not defective. *See, e.g., Smith*, 740 F. App'x at 726–27 ("[The plaintiff] criticizes the ALJ's reliance on an RFC that did not incorporate the functional limitations asserted by [plaintiff's] treating physicians regarding attendance and ability to remain on task.  But these opinions were discounted, and their conclusions rejected.  The Commissioner's burden at step five is to show the existence of possible employment for an individual with the RFC *determined by the ALJ* in the fourth step of the sequential analysis.  It was therefore proper for the vocational expert to respond to hypotheticals premised on the ALJ's RFC.") (citation omitted).

"An ALJ may rely on a [VE's] testimony regarding a hypothetical as long as there is substantial record evidence to support the assumptions upon which the vocational expert based his opinion and accurately reflects the limitations and capabilities of the claimant involved." *McIntyre*, 758 F.3d at 150 (internal quotation marks and citation omitted). As discussed, the ALJ properly weighed the record evidence and her RFC determination was supported by substantial evidence. Therefore, the ALJ appropriately relied upon the VE's testimony at Step Five.

IV.   **CONCLUSION**

For the reasons stated, the Court concludes that the ALJ's decision was supported by substantial evidence and free of legal error. Therefore, the Plaintiff's Motion to Reverse the Decision of the Commissioner is **DENIED**, and the Defendant's Motion for an Order Affirming the Commissioner's Decision is **GRANTED**.

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c). The Clerk is directed to enter judgment affirming the Commissioner's decision and to close this case.

It is so ordered this 19th day of October, 2020.


                                        */s/ Thomas O. Farrish*
                          _____
                                    Hon. Thomas O. Farrish
                                 United States Magistrate Judge